1   FRANK M. PITRE (SBN 100077)
    fpitre@cpmlegal.com
2   CHRISTOPHER LAVORATO (SBN 221034)
    clavorato@cpmlegal.com
3   ARON LIANG (SBN 228936)
    aliang@cpmlegal.com
4   ALEXANDRA A. HAMILTON (SBN 280834)
    ahamilton@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
6   840 Malcolm Road, Suite 200
    Burlingame, CA 94010
7   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
8
    *Attorneys for Plaintiffs*
9
                    **UNTIED STATES DISTRICT COURT FOR THE**
10
                    **NORTHERN DISTRICT OF CALIFORNIA**
11
                                    **CV 13 3684**
12
13  **LIMAN QIAN, an individual; LIMAN**        CASE NO. _____
    **QIAN, Custodial Parent and Next Friend**
14  **of AMANDA MA, an individual; and**        **COMPLAINT FOR:**
    **SHUZHI HAN, an individual,**
15                                              1.   **NEGLIGENCE**
            **Plaintiffs,**                          **(ASIANA AIRLINES)**
16
            **vs.**                             2.   **PASSENGER LIABILITY**
17                                                   **(ASIANA AIRLINES)**
    **ASIANA AIRLINES, INC., a corporation;**
18  **and THE BOEING COMPANY, a**              3.   **NEGLIGENCE**
    **corporation,**                                **(THE BOEING COMPANY)**
19
            **Defendants.**                     4.   **BREACH OF WARRANTY**
20                                                   **(THE BOEING COMPANY)**

21                                              5.   **STRICT LIABILITY**
                                                     **(THE BOEING COMPANY)**
22
                                                     <u>**JURY TRIAL DEMANDED**</u>
23

24

25

26

27

28
    _____
    COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................... 1

II.   JURISDICTION AND VENUE .................................... 2

III.  PARTIES .................................................. 2

    A.   Plaintiffs ............................................. 2

    B.   Defendants ........................................... 3

    C.   Agency and Concert of Action .......................... 4

IV.  FACTUAL BACKGROUND FOR THE CLAIMS ASSERTED .......... 4

    A.   History of the Aircraft that Crashed ...................... 4

        1.   Boeing Designed, Manufactured, Promoted and Sold the Boeing 777 As Safe For Air Travel .................................. 4

        2.   Asiana Purchased the Ill-Fated Aircraft in 2006 .............. 6

    B.   Both Asiana Airlines and Boeing 777 Aircraft Have Been Involved in a Number of Prior Incidents Which Raised Safety Concerns ........... 6

        1.   Despite Boeing Touting The Sophistication of The Design Of The 777 Model Aircraft, It Has Been Involved in A Number of Aviation Incidents ........................................ 6

        2.   In 2009 A Turkish Airlines Boeing 737 Crashed Under Very Similar Circumstances as Flight 214 Placing Boeing On Notice of Design Defects In The Low Speed Warning System On Its Aircraft ...... 7

        3.   Asiana Airlines Had Numerous Prior Incidents Providing Asiana With Notice Of Safety Concerns For The Training and Fitness Of It's Pilots ......................................... 9

    C.   The Horrific and Fatal July 6, 2013 Crash ...................... 11

    D.   Boeing Installed a Faulty and/or Defective Auto-Throttle Control System With Latent Dangerous Shortcomings ....................... 22

    E.   Boeing Failed to Install an Adequate Low Airspeed Warning System ... 24

    F.   Boeing and Asiana Failed to Properly Train Its Pilots .............. 25

    G.   Boeing and/or Asiana Designed and Installed Lap Only Seat Belts In Sections Of The Boeing 777 That Crashed ....................... 26

---

V.   **CAUSES OF ACTION** .......................................... 29

     FIRST CAUSE OF ACTION
     NEGLIGENCE (ASIANA AIRLINES) ......................... 29

     SECOND CAUSE OF ACTION
     PASSENGER LIABILITY/STRICT LIABILITY (ASIANA AIRLINES) 31

     THIRD CAUSE OF ACTION
     NEGLIGENCE (THE BOEING COMPANY) ..................... 31

     FOURTH CAUSE OF ACTION
     BREACH OF WARRANTY (THE BOEING COMPANY) .......... 34

     FIFTH CAUSE OF ACTION
     STRICT LIABILITY (THE BOEING COMPANY) ............... 35

VI.  **PRAYER FOR RELIEF** ........................................ 35

VII. **JURY DEMAND** .............................................. 36

1    Plaintiffs bring this action for damages and complain of the Defendant ASIANA
2  AIRLINES, INC. ("ASIANA") and Defendant THE BOEING COMPANY ("BOEING") as
3  follows:

4  **I.    INTRODUCTION**

5    1.    On July 6, 2013 at approximately 11:27 a.m. PDT, ASIANA Flight 214 violently
6  struck the sea wall immediately prior to the runway 28L threshold at San Francisco International
7  Airport ("SFO") while attempting to land following a perilously low altitude flight-path, low air-
8  speed approach. The crash tossed and bounced the passengers like rag dolls, ejecting some
9  passengers and flight attendants through the gaping cavity created by the separation of the aircraft's
10  empennage from the fuselage. Once the aircraft came to a standstill, passengers hobbled from the
11  twisted wreckage and emergency responders rushed to extricate the remaining injured and trapped
12  passengers before flames engulfed the plane. This horrific, unforgettable nightmare resulted in the
13  death of three teenage passengers and injury to 181 additional people onboard the aircraft.

14    2.    In a matter of seconds, what should have been a routine landing turned into a chamber
15  of horrors for the unsuspecting passengers. At the center of this tragedy are several factors. First,
16  BOEING inadequately designed, manufactured, distributed and/or sold the aircraft that crashed on
17  July 6, 2013 with a number of defects, including a faulty auto-throttle control system, inadequate
18  auto-throttle warnings, ineffective low-speed warnings, and/or lap-only seat belts in sections of its
19  aircraft. Second, BOEING failed to adequately train, notify, monitor, supervise and/or update pilots
20  to fly the BOEING 777-200ER; and/or warn ASIANA of concerns BOEING knew or should have
21  known about the unfitness of ASIANA pilots to fly the BOEING aircraft. Third, ASIANA
22  negligently operated, maintained, controlled, equipped, and/or piloted the fateful aircraft, including
23  failing to provide passengers in Economy Class with the same robust seat restraint systems as those
24  in Business Class. Fourth, ASIANA failed to properly hire, train, and/or monitor its pilots to assure
25  they had the required skill and experience to safely land their aircraft at all airports in which they did
26  business. This crash and its aftermath should never have occurred. It was a by-product of reckless
27  inattention by the ASIANA pilots in combination with dangerous shortcomings with auto flight
28  modes and low airspeed warning systems incorporated into the BOEING aircraft.

**COMPLAINT**                                                                                          1

1 **II.    JURISDICTION AND VENUE**

2    3.    This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331(a)
3 in that this matter arises under the laws and treaties ratified by the United States, including but not
4 limited to the Convention for the Unification of Certain Rules for International Carriage by Air
5 ("Montreal Convention"). Defendant ASIANA is a signatory to the Montreal Convention via the
6 International Air Carrier Transportation Association ("IATA") Intercarrier Agreement on Passenger
7 Liability which specifically removes limitations on damages.

8    4.    The Court also has subject matter jurisdiction of this dispute pursuant to 28 U.S.C.
9 § 1332, as this case involves a dispute between Plaintiffs, United States citizens domiciled in
10 California, and Defendants, corporations based in South Korea and the State of Illinois, and the
11 amount in controversy exceeds the jurisdictional minimum of this Court.

12    5.    Venue is proper in this District pursuant to Article 33(1) of the Montreal Convention
13 because Plaintiffs' principal and permanent residence is in the Northern District of California,
14 ASIANA operates services for the carriage of passengers by air to and from San Francisco, and the
15 ultimate destination of Plaintiffs' ticketed journey was San Francisco, all of which is located in the
16 Northern District of California.

17    6.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs'
18 principal and permanent place of residence is in the Northern District of California and because
19 Defendants are subject to personal jurisdiction in the Northern District of California. Defendants
20 have sufficient contacts because they do business and/or commerce in California.

21 **III.    PARTIES**

22    **A.    Plaintiffs**

23    7.    Plaintiff **LIMAN QIAN** is a citizen of the United States with her principal and
24 permanent residence in the City of San Francisco, within the Northern District of California.
25 LIMAN QIAN was a passenger on board ASIANA Flight 214 when it crashed on July 6, 2013 with
26 purchased tickets for the flight with a final destination of San Francisco, within the Northern District
27 of California.

28 ///

8.     Plaintiff **LIMAN QIAN** is also the custodial parent and Next Friend of Plaintiff AMANDA MA, a minor.

9.     Plaintiff **SHUZHI HAN** holds a green card for permanent residency in the United States with her principal and permanent residence in the City of San Francisco, within the Northern District of California. Seventy-two-year-old SHUZHI HAN was a passenger on board ASIANA Flight 214 when it crashed on July 6, 2013 with purchased tickets for the flight with a final destination of San Francisco, within the Northern District of California.

10.    Plaintiff **AMANDA MA** is a minor and a citizen of the United States with her principal and permanent residence in the City of San Francisco, within the Northern District of California. AMANDA MA was a passenger on board ASIANA Flight 214 when it crashed on July 6, 2013 with purchased tickets for the flight with a final destination of San Francisco, within the Northern District of California.

**B.     Defendants**

11.    Defendant **THE BOEING COMPANY** is a Delaware corporation with its principal place of business in the State of Illinois. Boeing is, and at all relevant times was, registered with the California Secretary of State as doing business in California, and it does business in California and in this Judicial District.

12.    Defendant **ASIANA AIRLINES, INC.** is a foreign corporation domiciled in and existing under the laws of South Korea. Defendant ASIANA AIRLINES is, and at all relevant times was, registered with the California Secretary of State as doing business in California, and it does business in California and in this Judicial District.

13.    Defendant **ASIANA AIRLINES, INC.** is, and at all times relevant was, a common carrier for hire in the business of soliciting and/or transporting passengers for regularly scheduled flights in and out of San Francisco International Airport to destinations in South Korea and throughout the world.

14.    Defendant **ASIANA AIRLINES, INC.** is, and at all times relevant was, a carrier within the meaning of the Montreal Convention, operating round-trip flights between San Francisco, California, to Seoul, South Korea and throughout the world.

1

C. **Agency and Concert of Action**

2    15.    At all times herein mentioned, Defendants, and each of them, were the agents,
3 servants, alter egos, employees, partners, aiders and abettors, co-conspirators and/or joint venturers
4 of each of the remaining Defendants named herein and were at all times operating and acting within
5 the purpose and scope of said agency, service, employment, partnership, enterprise conspiracy, alter
6 ego and/or joint venture, and each Defendant has ratified and approved the acts of each of the
7 remaining Defendants. Each Defendant aided and abetted, encouraged, and rendered substantial
8 assistance to the other Defendants in breaching their obligations to Plaintiffs, as alleged herein. In
9 taking action to aid and abet and substantially assist the commission of these wrongful acts and other
10 wrongdoings complained of herein, each of the Defendants acted with an awareness of his/her/its
11 primary wrongdoing and realized that his/her/its conduct would substantially assist the
12 accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

13 **IV.    FACTUAL BACKGROUND FOR THE CLAIMS ASSERTED**

14    A.    **History of the Aircraft that Crashed**

15        **1.    Boeing Designed, Manufactured, Promoted and Sold the Boeing 777 As**
16                **Safe For Air Travel**

17    16.    Defendant THE BOEING COMPANY ("BOEING") designs, manufactures, inspects,
18 assembles, markets and sells large commercial jet aircraft and provides product-related instructions,
19 manuals, maintenance and training to airline customers worldwide. BOEING's main commercial
20 products are the 737, 747, 757, 767, 777, and 787 families of airplanes and the BOEING Business
21 Jet.

22    17.    The BOEING 777 is a long-range wide-body twin-engine jet airliner designed,
23 manufactured, marketed, and sold by BOEING. According to BOEING, the BOEING 777 was the
24 first entirely new airplane manufactured by BOEING in more than a decade and was the first jetliner
25 to be 100 percent digitally designed using three-dimensional computer graphics. Throughout the
26 design process, the airplane was "preassembled" on the computer, eliminating the need for a
27 full-scale mock-up. The BOEING 777 program was launched in October 1990, and, in June 1995,
28 United flew its first 777 in revenue service. **BOEING touts the BOEING 777 as "the widest, most**

COMPLAINT                                                                    4

1  spacious airplane in its class and includes improvements in airfoil technology, flight deck
2  design, passenger comfort and interior flexibility. Its greater payload and range capability
3  result in lower operating costs to airlines, and its standard equipment includes many features
4  that are optional on other airliners."

5  18.  The BOEING 777 family has become one of BOEING's best-selling airframe models.
6  As of June 2013, sixty airlines had placed orders for 1,452 BOEING 777s of all variants, with 1,113
7  delivered to date. As of June 2013, BOEING has delivered 421 of the 777-200ER model, making
8  it the most common variant of the BOEING 777. The original BOEING 777-200 variant entered
9  commercial service in 1995, followed by the extended-range 777-200ER in 1997. \

10  19.  **BOEING designed, manufactured, assembled, tested, serviced, and/or sold the**
11  **BOEING 777-200ER aircraft that crashed on July 6, 2013 and various components of the**
12  **subject aircraft including, but not limited to, the auto-throttle, autopilot, flight control**
13  **computers, warning systems, primary flights displays, overhead compartments, seats, and/or**
14  **seatbelts.**

15  20.  In addition, BOEING wrote and/or approved instructions and warnings for the subject
16  aircraft, including flight manuals, operation manuals, maintenance manuals, maintenance
17  instructions, inspection schedules, and service life schedules to be followed by owners and operators,
18  including ASIANA, for the continued airworthiness and safe flight of the BOEING 777-200ER
19  aircraft, including the subject aircraft.

20  21.  BOEING also provided customer support to ASIANA, as it related to the subject
21  aircraft and other 777-200ER aircraft in its possession, including Alert Service Bulletins, Service
22  Bulletins, Service Letters, Technical Advisors, aircraft parts, engineering and training personnel, and
23  other similar customer support services.

24  22.  **BOEING maintains, operates, runs, supports, advertises, and/or promotes**
25  **twenty training campuses with more than 80 full-flight simulators around the world. At these**
26  **facilities, BOEING offers courses to train and transition pilots smoothly and effectively and**
27  **keep them qualified, consistent with an airline's standards and procedures.** BOEING's North
28  America flight training facility in Miami, Florida is one of the largest in the world and trains pilots

1    and flight crews on the BOEING's 737, 757, 767, and 777 aircrafts, as well as the Airbus 320

2    ("A320"). **In 2002, BOEING entered into contract with ASIANA to train all of ASIANA's**

3    **pilots. In addition, BOEING operates a training campus for ASIANA near the Gimpo**

4    **International Airport in South Korea. The Gimpo facility, which opened in 2006, specializes**

5    **in flight training for the 777.**

6                   **2.    Asiana Purchased the Ill-Fated Aircraft in 2006**

7        23.     Defendant ASIANA is one of South Korea's two major airlines and was established

8    in 1988. As a member of Star Alliance, Defendant ASIANA operates fourteen domestic and ninety

9    international passenger routes, and twenty-seven cargo routes throughout Asia, Europe, North

10   America, and Oceania. Defendant ASIANA currently maintains a fleet of seventy-nine aircraft,

11   twelve of which are the BOEING 777-200ER model. The ill-fated aircraft was a BOEING 777-

12   200ER built by BOEING and delivered to ASIANA in March 2006.

13        **B.     Both Asiana Airlines and Boeing 777 Aircraft Have Been Involved in a Number**

14                **of Prior Incidents Which Raised Safety Concerns**

15        24.     The July 6, 2013 incident is only one example in a long list of ASIANA and BOEING

16   incidents. Since the BOEING 777 was first delivered, BOEING aircraft have had numerous

17   incidents involving engine malfunctions and fires, primarily during preparation for take-off, the take-

18   off itself, and landing. In addition, in 2009, a Turkish Airlines BOEING 737 crashed under very

19   similar circumstances to the July 6, 2013 crash of ASIANA Flight 214. Moreover, since its

20   establishment in 1988, ASIANA has had multiple incidents involving pilot error during take-offs and

21   landings – the most dangerous time of a flight – and/or malfunctions with BOEING aircraft owned

22   and operated by ASIANA.

23                   **1.    Despite Boeing Touting The Sophistication of The Design Of The 777**

24                       **Model Aircraft, It Has Been Involved in A Number of Aviation Incidents**

25        25.     On **September 5, 2001,** a British Airways BOEING 777 suffered fire damage to the

26   lower wing panels and engine housing compartment during a refueling fire at Denver International

27   Airport, causing fatal burns to one person.

28   ///

26.     On **January 17, 2008**, British Airways Flight 38, a BOEING 777-200ER (the same model of aircraft involved in the ASIANA July 6, 2013 incident) with Rolls-Royce Trent 895 engines flying from Beijing to London, crash-landed approximately 1,000 feet short of London Heathrow Airport's runway 27L. The aircraft slid onto the runway's threshold, injuring forty-seven people and damaging the aircraft's landing gear, wing roots, and engines. Upon investigation, it was determined that the accident was caused by ice crystals from the fuel system clogging the fuel-oil heat exchanger. In 2009, in response to the 2008 incident, air accident investigators called for a redesign of this fuel-oil heat exchanger on the Trent 800 series engine. Redesigned fuel oil heat exchangers were installed on British Airways' BOEING 777s by October 2009.

27.     In **February and November 2008**, two other Trent 895 engines on BOEING 777 aircraft suffered loss of thrust. The National Transportation Safety Board ("NTSB") investigators concluded that, just as on January 17, 2008, the loss of power was caused by ice in the fuel system, clogging the fuel-oil heat exchanger.

28.     On **July 29, 2011**, an Egypt Air BOEING 777-200ER suffered a cockpit fire while parked at a gate at Cairo International Airport, causing structural, heat, and smoke damage to the aircraft. The plane was successfully evacuated with no injuries to personnel, and airport fire teams extinguished the fire. Investigators focused on a possible electrical fault with a supply hose in the cockpit crew oxygen system.

> **2.      In 2009 A Turkish Airlines Boeing 737 Crashed Under Very Similar Circumstances as Flight 214 Placing Boeing On Notice of Design Defects In The Low Speed Warning System On Its Aircraft**

29.     On February 25, 2009, a Turkish Airlines owned and operated a BOEING 737-800 crashed during landing at Amsterdam Schiphol Airport, Netherlands. The tragedy resulted in the deaths of nine passengers and crew including all three pilots.

30.     An investigation revealed that the left radio altimeter had malfunctioned, causing the auto-throttle to disregard the pilots' selected speed setting, whereby reducing the throttle level position to flight-idle and allowing the airspeed of the BOEING 737 to decrease 40 knots below the selected airspeed. This flight condition went unnoticed by the pilots, who were relying on the auto-

1   throttle to maintain the approach speed, until it was too late. The pilots did not recognize the
2   reduction in speed and excessively high pitch attitude of the aircraft until the stall warning went off
3   at an altitude of 460 feet. As a result of the perilous loss of airspeed and the delayed warning, the
4   BOEING 737 lost control and crashed before reaching the runway. Because the aircraft's nose was
5   pitched up, the tail struck the ground first before the rest of the aircraft slammed down on the tarmac.
6   The impact separated the horizontal stabilizer, both main landing gear legs, and the left and right
7   engines from the aircraft.

8           31.     The Dutch Safety Board reached the following main conclusion: During the accident
9   flight, while executing the approach by means of the Instrument Landing System ("ILS") with the
10  right autopilot engaged, the left radio altimeter system showed an incorrect height of -8 feet on the
11  left primary flight display. This incorrect value of -8 feet resulted in activation of the 'retard flare'
12  mode of the auto-throttle, whereby the thrust of both engines was reduced to a minimal value
13  (approach idle) in preparation for the last phase of the landing. Due to the approach heading and
14  altitude provided to the crew by air traffic control, the localizer signal was intercepted at 5.5 NM
15  (nautical miles) from the runway threshold with the result that the glide slope had to be intercepted
16  from above. This obscured the fact that the auto-throttle had entered the retard flare mode. In
17  addition, the flight condition increased the crew's workload significantly. When the aircraft passed
18  below a height of 1000 feet, the approach was not yet stabilized, and thus, the crew should have
19  initiated a go around. The right autopilot (using data from the right radio altimeter) followed the
20  glide slope signal. As the airspeed continued to drop, the aircraft's pitch attitude kept increasing to
21  maintain its path along the glide slope. The crew failed to recognize the airspeed decay and the pitch
22  increase until the moment the stick shaker was activated. Subsequently the approach to stall recovery
23  procedure was not executed properly, causing the aircraft to stall and crash.

24          32.     **In response to its findings, the Dutch Safety Board recommended BOEING**
25  **evaluate the benefits of installing an aural command low-speed warning in the aircraft. Since**
26  **then, BOEING has retrofitted 400 of the world's 3,900 BOEING 737 models with an aural**
27  **command warning of "LOW AIRSPEED, LOW AIRSPEED." However, the vast majority of**
28  / / /

1    **BOEING 737 aircrafts – let alone its other models – were not updated with this aural**

2    **command warning and instead, incorporate an aural tone warning.**

3              **3.    Asiana Airlines Had Numerous Prior Incidents Providing Asiana With**

4                    **Notice Of Safety Concerns For The Training and Fitness Of It's Pilots**

5        33.    On **July 26, 1993**, a BOEING 737-500 passenger aircraft owned, operated,

6    maintained, and flown by ASIANA crashed during landing. The pilot attempted two landings at

7    South Korea's Mokpo Airport in poor weather. The pilot's third attempt resulted in the pilot

8    slamming the plane into Mount Ungeo, eight hundred feet above ground. Of the 116 occupants,

9    sixty-six passengers and two crew members, including the pilot, died.

10      34.    On **November 30, 1998**, an ASIANA BOEING 747 struck a crane in Jamaica, New

11    York. According to the NTSB report, one person was injured when the airplane struck a crane next

12    to the taxiway. The first officer misjudged the clearance between the right wing and the crane, and

13    the only conversation between the crew members was a "right side clear" callout by the first officer.

14    Despite the close proximity between the airplane and the construction materials, the crew continued

15    taxiing the airplane. The right wing struck the crane, causing damage to that wing and causing the

16    crane to topple over and eject the occupant.

17      35.    On **November 11, 2000**, an ASIANA BOEING 747 taxiing at Ted Stevens

18    Anchorage International Airport in Anchorage, Alaska, collided with a parked Aeroflot Ilyushin

19    Il-62. According to NTSB reports, the BOEING 777 flight crew reported to the tower that braking

20    action on the runway was poor. While taxiing to the parking ramp, the captain commented to the first

21    officer that the airplane was skidding. As the airplane approached the gate, ground personnel

22    observed the airplane's nosewheels turn 90 degrees toward the gate, but the airplane continued

23    straight ahead, skidding the nosewheels sideways. Ground personnel heard, and the Flight Data

24    Recorder confirmed, an increase in engine power as the airplane continued past the gate. The

25    airplane was then observed turning right, away from the terminal, and colliding with a parked

26    IL-62M airplane and causing injuries to the cleaning crew aboard the IL-62M. The ASIANA crew

27    told the NTSB investigator-in-charge that they did not use brakes until attempting to turn away from

28    the parked airplane and ground witnesses described the taxi speed as "faster than normal." The

1   maximum ground speed recorded by the on-board recorders was 16 knots. The company flight
2   manual states, in part: "(1) Turning... 10 knots or below (5 knots if wet or slippery)." Snow
3   contamination was recorded by the airport authority commencing 11 hours prior to the accident. The
4   NTSB pointed to the excessive taxi speed by the pilot-in-command and the pilot's inadequate
5   maneuver to avoid the parked airplane as causes of the collision.

6       36.    On **August 19, 2004**, a collision between an ASIANA BOEING 747 and a Southwest
7   Airlines BOEING 737 at Los Angeles International Airport was narrowly averted. The ASIANA
8   aircraft had been cleared to land when it initiated a go-around. A go-around occurs when the flight
9   crew aborts the landing and attempts to land again. In conducting the go-around, the ASIANA crew
10  overflew the Southwest Airlines BOEING 737 which had been cleared into position and was on hold
11  for takeoff on the same runway. The ASIANA aircraft cleared the Southwest aircraft by a mere 200
12  feet during the go-around.

13      37.    On **October 28, 2009**, the tail of an ASIANA Airbus A321-200 carrying 147
14  occupants struck the runway on landing at Kansai International Airport in Japan. According to a
15  Japan Transport Safety Board report, the aircraft sustained damage in the aft part of the fuselage
16  which contacted the runway as evidenced by the excessively high pitch angle after the touchdown
17  on the runway. The aircraft's pitch angle became excessive because the first officer continued
18  inputting pitch-up signals even after touchdown. The flare[1] by the first officer was inappropriate and
19  as a result, the sink rate of the Aircraft was not arrested, causing the Aircraft to land with a strong
20  impact on the ground. The first officer misjudged and miscalculated his flare as evidenced by his
21  continuous input for pitch-up after touchdown.

22      38.    On **July 28, 2011**, an ASIANA BOEING 747 cargo plane built in 2006, en route from
23  Seoul's Incheon International Airport to Shanghai Pudong International Airport in China, crashed
24  into the East China Sea, killing the only two crew on board. The aircraft involved was operating
25  ASIANA's scheduled international cargo service. The crash occurred off the coast of Jeju Island

26

27      [1] The landing flare is a maneuver or pilot imputed flight condition during the landing of
28  an aircraft in which the nose of the plane is raised, slowing the descent rate, and the proper
    attitude is set for touchdown.

**COMPLAINT**                                                                    10

1   after the crew reported a fire in the cargo compartment and attempted to divert to Jeju International

2   Airport. Eighteen minutes after the pilots noticed the fire, the aircraft plunged into the water.

3          **C.     The Horrific and Fatal July 6, 2013 Crash**

4          39.    On July 6, 2013, a Boeing 777-200ER owned, operated, and flown by ASIANA and

5   designated as Flight 214 departed from Seoul, South Korea for the approximately eleven-hour flight

6   to SFO. On that day, Flight 214 carried 291 passengers and sixteen crew members. Three captains

7   and a first officer were among the crew members and rotated in two-person shifts during the

8   long-haul flight.

9          40.    This was the "flying pilot" ("FP")[2] first time landing a BOEING 777 at SFO. From

10  2005 to 2013, the "flying pilot" was a captain on the Airbus A320 and was also a ground school

11  instructor and flight simulator instructor for A320 and A321 aircraft. On July 6, 2013, the "flying

12  pilot" was in the process of completing his Initial Operating Experience ("IOE"), required to certify

13  and/or qualify him to fly the BOEING 777 as pilot in command. ASIANA requires that pilots

14  complete twenty flights and sixty hours of flight time during the IOE for an aircraft. On July 6,

15  2013, the "flying pilot" was about half way through his required IOE training, having completed ten

16  legs and about thirty-five hours of flight time.

17         41.    The supervising captain, sitting in the right seat of the cockpit next to the "flying

18  pilot," was on his first training flight in which his role was to supervise or instruct another pilot.

19  Flight 214 was the first time he had flown with the "flying pilot."

20         42.    During landing, the relief first officer was sitting in the observer's seat in the cockpit

21  while the relief captain was sitting in the cabin, outside the cockpit. These relief pilots had flown the

22  plane for a five hour period, giving the flying and supervising pilots an in-flight break, until ninety

23  minutes prior to the scheduled landing, at which time the flying and supervising pilots resumed

24  control.

25  ///

26

27
_____

28         [2] "Flying pilot" in the context of this complaint refers to the pilot who was sitting in the left seat
     of the Boeing 777-200ER and was in training to become a Captain of the Boeing 777-200 aircraft.
_____

1    43.    Flight 214 approached SFO on Saturday, July 6, 2013 at approximately 11 a.m. on
2 a seventeen-mile straight-in visual approach, heading to San Francisco. It should have been a
3 simple, safe, and routine landing. Visual Meteorological Conditions ("VMC") existed, with clear
4 sky, light wind, no wind shear, and visibility exceeding ten miles. Inside the airplane, passengers
5 had placed their seat backs in the upright position, locked their tray tables in place, and stowed away
6 their electronics and carry-on luggage in preparation for landing. Unbeknownst to the 291
7 passengers, the landing would turn into a violent, unforgettable catastrophe.



20    44.    At 11:19 a.m., approximately ten minutes before the crash, at an altitude of 9,000 feet,
21 Northern California ("NorCal") Terminal Radar Approach Control ("TRACON"), an air traffic
22 control facility that provides safety alerts, separation, and sequencing of air traffic arriving,
23 departing, and transiting, instructed the Flight 214 pilots to turn left to a heading of 100 degrees and
24 to descend to 6,000 feet.

25    45.    At 11:20 a.m. and at 7,600 feet, TRACON instructed the pilots to turn left to 030
26 degrees and to descend to 3,000 feet.

27  / / /

28  / / /

**COMPLAINT**                                                                                      12

1       46.    At 11:21 a.m. and at 5,800 feet, the pilots were instructed to turn left to 310 degrees.

2  TRACON also cleared Flight 214 for a visual approach on runway 28L. Since the glide slope

3  transmitter for the Instrument Landing System ("ILS") approach on runway 28L at SFO had been out

4  of service since June 1, 2013, the crew landed the aircraft in visual conditions.



22       47.    At 11:23 a.m. and 4,500 feet, TRACON instructed the pilots to fly 180 knots until

23  5 miles from airport in order to properly space incoming aircraft.

24  / / /

25  / / /

26  / / /

**COMPLAINT**            13

1    48.    At 11:25 a.m. and at 2,400 feet, TRACON instructed the pilots to contact SFO control

2    tower. At 11:26 and at 2,000 feet, the pilots first attempted to contact the control tower.



17    49.    Eighty-two seconds before the crash and at an altitude of 1,600 feet, the aircraft's

18    Digital Flight Data Recorder ("DFDR") indicated that the pilot disengaged the aircraft's auto-pilot.

19    Nine seconds later the airplane was at 1,400 feet and the airspeed was 170 knots (196 mph). At

20    1,000 feet and 54 seconds before impact, the airplane had slowed to 149 knots in the landing

21    configuration.

22    50.    At 11:26 a.m. and at an altitude of 1,000 feet, the pilots made their second attempt

23    to contact the control tower. At this time, fifty-four (54) seconds before impact, the airplane had

24    slowed to 149 knots.

25    / / /

26    / / /

27    / / /

28

---

**COMPLAINT**                                                                                      14

1   51.    At 11:27 a.m. and at 600 feet, the control tower cleared Flight 214 for landing.



15   52.    At approximately thirty-four seconds before impact, the subject aircraft's DFDR
16   indicated that the plane slowed below the appropriate approach threshold of 137 knots (158 mph)
17   which is required to stabilize and safely operate the aircraft. The supervising pilot told the NTSB
18   that, at this point, he saw three red and one white Precision Approach Path Indicators ("PAPI")[3]
19   lights. The three red and one white PAPI indicated that the plane was flying below the three degree
20   glide path. The first relief officer also claimed to have noticed that the nose of the aircraft pitched
21   / / /
22   / / /
23   / / /
24
25
       [3] PAPI is a light array system consisting of four light units located near the runway and
26   visible from up to five miles away. PAPI provides a visual descent path to the runway
     touchdown zone. When the four light units are white, the plane's flight path is too high and, if
27   maintained, will cause the aircraft to land beyond the touchdown zone. When the four light units
     are red, the plane is too low and, if maintained, will cause the aircraft to land below touchdown
28   zone. When the array displays two red and two white light units, the plane is at the proper three
     degree angle descent path.

COMPLAINT                                                                                      15

1  up, obstructing his view of the runway. The supervising pilot instructed the "flying pilot" to increase
2  speed. The "flying pilot" previously set the speed for 137 knots and assumed that the auto-throttle
3  control system, similar to a car's cruise control, was maintaining the aircraft's speed.



16      53.     At approximately 500 feet, the flight crew realized that they were approaching the
17  runway off course and concentrated on correcting the problem. Because the pilots' focus was on
18  aligning the aircraft's lateral course center with runway 28L, the pilots did not realize that the aircraft
19  had slowed and descended until it was too late to recover airspeed and regain altitude.

20      54.     Eight seconds before impact and 200 feet above sea level, the aircraft's airspeed
21  dropped to 118 knots. At this point, the supervising pilot noticed that all four PAPIs were red and
22  that the auto-throttle control system was not maintaining speed. The aircraft further slowed to 103
23  knots, which is 34 knots – or twenty-five percent – slower than the desired target airspeed for a safe
24  landing.

25      55.     Seven seconds before impact, one of the pilots called to increase airspeed, barely
26  increasing the aircraft's airspeed to 106 knots before the impending crash.

27  / / /

28

COMPLAINT                                                                                              16

56. Three seconds before the crash, one of the pilots called for a go-around on the radio. At the same time, a warning of an aerodynamic stall[4] occurred. The aural warning tone, accompanied by a tactile vibration warning on the throttle (also known as "stick shaker"), notified the pilots that the plane was flying too slow, was about to stall, and was losing its ability to stay aloft. In response to the stall warning and one and a half seconds before impact, another pilot attempted to abort the landing by initiating a go-around. However, it was too late for the pilots to correct the situation.

57. The crew did not warn or notify the unsuspecting passengers of the impending disaster before the tail of the aircraft forcefully struck the rock seawall immediately before SFO's Runway 28L at 106 knots (122 mph). The seven-year old BOEING 777-200 suffered separation of the empennage[5] from the fuselage, leaving a gaping cavity in the rear portion of the aircraft. Flung in their seats, passengers heard the searing scrape of metal against stone and asphalt as the aircraft struck the sea wall and slid across the tarmac before spinning counterclockwise and resting on its belly, creating a path of debris and ejecting aircraft occupants onto the runway from the gaping hole where the empennage was once attached.

/ / /

/ / /

/ / /

---

[4] A low-speed aerodynamic stall occurs when the airspeed slows, altering the angle-of-attack of the aircraft's wing relative to airflow under and over the wing. This disrupts the airflow to the point that the wing can no longer generate the lift required to fly safely.

[5] The empennage is the aircraft's tail assembly and includes the vertical fin and horizontal stabilizers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   ///
26
27
28



58.     The powerful crash sequence jerked, bounced, and tossed the passengers inside the aircraft. Passengers in Flight 214's economy class were thrown over their lap-only seat belts, causing some passengers to hit their heads on the armrests and/or on the seatbacks in front of them, some of which collapsed due to the impact. The aircraft's cabin interior suffered heavy damage with overhead compartments opening upon impact, tossing luggage onto the passengers and blocking aisles. The crash uprooted seats, causing further injuries to passengers and blocking routes of egress.



59.     The seven-year-old BOEING 777-200 lost its tail section, including its vertical and horizontal stabilizers, leaving a ragged hole and flinging occupants out of the aircraft onto the runway. The BOEING 777's right engine detached from the wing and lodged against the right side of the fuselage. The left engine detached and landed to the right of runway 28L. Oil spewed from the aircraft, providing a dangerous source for ignition.

/ / /

/ / /

/ / /

1    60.    Despite the policy that planes must be manufactured <u>for all passengers</u> to be
2  evacuated within ninety seconds[6], **the emergency doors and chutes were not opened until**
3  **approximately ninety seconds after the plane came to a full stop** on the side of the runway. After
4  the crash, a flight attendant asked the pilots in the cockpit whether or not to evacuate the passengers.
5  The pilots informed the flight attendants not to evacuate the plane while the pilots talked to the SFO
6  tower. Another flight attendant made an announcement over the aircraft's PA system instructing
7  passengers to stay in their seats and not to evacuate. However, a flight attendant seated just forward
8  of the wing saw fire and smoke outside the window and notified the pilots. Only then did the pilots
9  order evacuation. **The NTSB Chairperson Debra Hersman called the pilots' order to delay**
10 **evacuation "unusual." The NTSB investigators "don't know what the pilots' were thinking"**
11 **by not ordering an immediate evacuation.**

12   61.    Once evacuation began, dazed and panicked passengers scrambled to leave the
13 aircraft before it erupted in flames. However, injuries, uprooted seats, scattered luggage, seat-belts
14 and faulty evacuation slides complicated the evacuation process. Evacuation slides are designed to
15 only inflate when put in an "armed position" and the doors are open; however, **two of the exit-door**
16 **emergency slides  deployed inside the plane during the crash sequence, causing an interior**
17 **danger to the crew and passengers, pinning two flight attendants, and limiting the number of**
18 **exit routes for those evacuating.** Emergency responders ran up one of the aircraft's inflated escape
19 chutes to get to those trapped inside, clearing a passage by tossing out luggage and wrecked overhead
20 bins that were blocking the escape route and/or pinning passengers as the flames spread. A black
21 plume of smoke rose into the sky as flames engulfed the aircraft and burned away the top of the
22 fuselage. Passengers, trapped by uprooted seats, luggage, and/or seatbelts, were surrounded by thick,
23 black smoke as rescuers lifted them to safety.

24

25

26   [6] The Federal Aviation Administration ("FAA") is focused on increasing the probability
     of occupant survival and decreasing the probability of death or injury in an aircraft accident.
     Research conducted by FAA on commercial aircraft exposed to an external fuel fire illustrated
27   that the time available for passenger evacuation before flash over occurred in the cabin was
     approximately ninety seconds. In response, the FAA established a regulation that commercial
28   aircraft must be able to demonstrate that a full load of passengers can be evacuated within ninety
     seconds to prevent death or injury from flash over.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28





62.     What should have been a safe and smooth landing, turned into a chaotic disaster, resulting in the death of three teenage girls and injuries to 181 other occupants. Emergency responders at the scene triaged the aircraft's occupants. The injured passengers and flight attendants were transferred to eleven different Bay Area hospitals. As hospitals fought to save lives and provide emergency care to these poor passengers, the NTSB initiated an investigation into the causes of this fateful crash.

**D.     Boeing Installed a Faulty and/or Defective Auto-Throttle Control System**
**With Latent Dangerous Shortcomings**

63.     The crash of Flight 214 occurred after the aircraft's speed dropped below the minimum speed needed to safely approach the runway, and land the aircraft. During the landing process, the ASIANA Flight 214 "flying pilot" set the airspeed for 137 knots and assumed that the auto-throttle control system was maintaining the aircraft's airspeed. However, due to BOEING's design, manufacture and/or installation of inadequate and/or defective auto-throttle control systems, auto-pilot control systems, and/or low airspeed warning systems in the aircraft, the pilots were not

1  warned of the malfunction, the disengaged auto-throttle and/or fatefully low airspeed until it was too
2  late to safely take corrective action.

3      64.    The auto-throttle control system can regulate engine power in all flight profiles
4  including take-off, climb, cruise, descent, approach, landing, and go-around. A pilot can program
5  the appropriate landing requirements into the aircraft's autopilot and/or auto-throttle control system;
6  thereby automating the process to properly maintain airspeed and glide path. While the auto-pilot
7  automates pitch and roll, the auto-throttle automates the engine power requirements to maintain
8  aircraft airspeed or vertical speed.

9      65.    In order for the automatic throttle control system to be operating and maintaining a
10  desired airspeed, it first must be armed and then engaged. To arm the auto-throttle control on a
11  B777-200ER, the pilots actuate two switches, one for the left and one for the right engine. Once
12  armed, the pilot can then engage the automatic throttle control by pressing another switch – which
13  then turns green. According to the Boeing 777 Operator's manual, if auto-throttle control is not
14  engaged, there are cautionary lights in the cockpit and an audible "tone" which would alert the crew
15  to the flight condition, until the condition is reset. The NTSB noted that the auto-throttle control
16  system was ARMED.

17      66.    Because the ASIANA pilots' focus was on centering the aircraft's course alignment
18  to Runway 28L, the pilots did not realize that the auto-pilot and/or auto-throttle control system was
19  not maintaining the aircraft's speed. By the time they noticed the deadly condition, it was too late
20  to correct the problem.

21      67.    BOEING failed to design, manufacture and/or install an effective warning system to
22  notify pilots whether or not the auto-throttle control system is armed and/or engaged, and/or the
23  consequent danger of disengagement known in some circles as the "Flight Level Change Trap".
24  BOEING also failed to warn, train and/or notify pilots to recognize auto-throttle control system
25  warnings and/or to constantly monitor airspeed when the auto-throttle control system is armed and/or
26  engaged, especially during landing.

27  / / /

28  / / /

---

**COMPLAINT**  23

1        **E.    Boeing Failed to Install an Adequate Low Airspeed Warning System**

2        68.    BOEING installed an ineffective and inadequate low airspeed warning system in its

3    777 models. The BOEING 777 has a low airspeed warning system which detects low airspeed and

4    alerts the crew with a standard warning tone followed by a text message on a display screen,

5    "AIRSPEED LOW." The standard warning tone requires the crew divert attention to the display

6    screen to determine the cause of the alert. The screen also contains other alerts, such as "OIL

7    PRESSURE LOW," "FUEL PRESSURE LOW," and other system status indicators. The inadequate

8    tonal warning poses the greatest danger during approach and landing conditions when low airspeed

9    situations are more likely to occur in addition to a number of different situations requiring the pilots'

10    attention.

11        69.    Because the ASIANA pilots' primary attention was on aligning the aircraft's course

12    to center on Runway 28L, the pilots did not realize that the auto-throttle control system was not

13    maintaining the aircraft's airspeed during the approach and that the aircraft had slowed to a

14    dangerously low airspeed. By the time the pilots recognized the problem, it was too late to correct.

15    Had an aural command warning of "AIRSPEED LOW " been installed in the aircraft, as it is in the

16    BOEING 737s and all Airbus models, the pilots would have realized that the aircraft was at a

17    dangerously low airspeed and could have taken immediate action to rectify the problem by increasing

18    airspeed and/or initiate a go around.

19        70.    BOEING knew or should have known that its standard warning tone was inadequate

20    and/or ineffective and should have updated its aircraft. The NTSB has urged the FAA to require

21    plane manufacturers to install an aural command low airspeed warning for nearly a decade. In 2003,

22    the NTSB noted that low airspeed was a factor in at least 18 accidents during the previous two

23    decades. In a November 18, 2003 report, the NTSB recommended noise alarms for low speed. The

24    NTSB had discovered a 1996 FAA panel had warned that flight crews might not get proper warning

25    of low airspeed before a stall is imminent. In a December 2, 2003 letter, the NTSB told the FAA that

26    in 11 accidents involving commuter airplanes and seven accidents involving commercial airplanes

27    since 1982 "a failure to maintain airspeed" contributed to the accident. The NTSB repeated its

28    recommendation and expanded it to cover all commercial, commuter and charter planes after a

1  February 12, 2009 Colgan Airlines crash near Buffalo killed fifty people. The NTSB reported, "An

2  aural warning in advance of the stick-shaker ... might have elicited a timely response from the

3  pilots."

4      71.     In response to the February 25, 2009 Turkish Airlines Flight 1951 crash, where the

5  pilots flying a BOEING 737 were unaware that the auto-throttle was not maintaining airspeed, the

6  Dutch Safety Board recommended that BOEING evaluate the benefits of installing an aural

7  low-airspeed warning system in the aircraft. BOEING responded by retrofitting 400 of

8  the world's 3,900 BOEING 737 models with an aural command warning of 'LOW AIRSPEED,

9  LOW AIRSPEED."

10     72.     Airbus SAS, the other leading manufacturer of commercial aircraft, has installed an

11  aural command warning of "SPEED-SPEED-SPEED" every five seconds between 2,000 and 100

12  feet when aircraft airspeed drops to an unsafe level. The aural command warning has been installed

13  on the A320 family of aircraft since 1995 and on all A330, 340, 350 and 380 aircraft.

14     73.     Despite being fully aware of the NTSB recommendations, the Dutch Safety Board's

15  recommendations, and Airbus' practice of implementing the systems, BOEING failed to retrofit or

16  reprogram its BOEING 777 with a continuous and/or aural command warning that is the most

17  effective method to alert the pilots to the critical and imminent danger of low airspeed.

18     **F.    Boeing and Asiana Failed to Properly Train Its Pilots**

19     74.     Despite ASIANA's reported practice of "put[ting] safety first," ASIANA failed to

20  properly train and supervise its pilots to ensure the safety of its passengers. ASIANA pilots are

21  required to complete classroom and flight simulator training. ASIANA trains its pilots at BOEING's

22  training facilities. In 2002, BOEING entered into contract with ASIANA to train all of ASIANA's

23  pilots. In 2006, when ASIANA received the subject aircraft, BOEING opened a BOEING 777

24  training facility near the Gimpo International Airport in South Korea.

25     75.     BOEING's training programs promise to help airlines "meet increasing demands for

26  qualified pilots by producing flight-ready officers quickly and efficiently." BOEING's full-flight

27  simulator training for its pilots is intended to allow ASIANA to economically enhance its quality

28  ///

1   flight training services and gain efficiencies in pilot training for ASIANA's fleet of BOEING
2   737-400/-500s, 747-400s, 767-300s, 777-200s and Airbus 321s.

3       76.     ASIANA also requires its pilots to complete an Initial Operating Experience ("IOE"),
4   which pairs pilots who are new to an aircraft model with more experienced supervising or training
5   pilots. The IOE requires twenty familiarization flights with sixty hours of flight time under the
6   supervision of pilots who are experienced with the particular aircraft model. ASIANA's IOE, along
7   with ASIANA's initial pilot training, calls for significantly less flying hours than what international
8   standards require in order to be considered qualified. BOEING, as the pilot training provider for
9   ASIANA, knew or should have known that ASIANA pilots proficiency for safely piloting its aircraft
10  were significantly below international standards.

11      77.     The pilot who attempted to land ASIANA Flight 214 on July 6, 2013, had only flown
12  a BOEING 777 on ten training flights for a mere thirty-five hours of flying time. On July 6, 2013,
13  the "flying pilot" unsuccessfully attempted to land the BOEING 777-200 at SFO for the first time.
14  According to ASIANA officials, the pilot was eleven flights short of the worldwide standard to meet
15  ASIANA's IOE policy. In addition, the supervising pilot was observing his first flight.

16  **G.      Boeing and/or Asiana Designed and Installed Lap Only Seat Belts In Sections**
17  **Of The Boeing 777 That Crashed**

18      78.     The Asiana Flight 214 BOEING 777-200 had multiple types of seat belt systems. In
19  Economy Class, passengers were provided with lap-only seat belts. Business class passengers, flight
20  attendants, and pilots were provided with multipoint harnesses, restraining those occupants by lap
21  and shoulder straps.

22
23
24    
25
26
27
28

1  79. Generally, airplane seatbelts must be designed so that a person making proper use of
2  the equipment will not suffer serious injury as a result of inertia forces during an emergency landing
3  or in flight turbulence.

4  80. Although lap-only safety belts are standard in many commercial airliners, studies have
5  consistently found significant benefits, in terms of injury reduction, through shoulder harness use.
6  A 1985 NTSB study found that shoulder harness were the most effective method of reducing fatal
7  and serious injuries in general aviation airplane accidents. According to the NTSB, shoulder harness
8  use could have prevented 75% of the fatalities and 79% of the serious injuries considered in its study.
9  In a 2011 analysis of over 37,000 general aviation accidents, the NTSB found that the risk of fatal
10 or serious injury with a lap-only safety belt was nearly 50% higher than the lap and shoulder harness
11 combination. The benefits rendered by the lap/shoulder harness combination were even greater in
12 accidents that occurred during take off and landing.

13



26 / / /
27 / / /
28 / / /



81. Shoulder harnesses are common throughout the aviation industry. Shoulder harnesses are required for all seats in general aviation aircraft. Under 14 C.F.R. § 91.521, all flight crew stations (e.g. pilots and flight attendants) must have a restraint system consisting of a combined safety belt and shoulder harness. Pilots usually have a five-point seat restraint system while flight attendants are provided four-point seat belts. Additionally, many private jets and first class cabins have lap and shoulder harness seat belt systems.

82. Unlike passengers in ASIANA Flight 214's Economy Class, passengers sitting in Business Class were more safely and robustly secured to their seats using lap and shoulder harnesses, protecting those particular passengers from jerking in their seats and striking their head and body against the aircraft. Eugene Rah, a passenger sitting in business class of Flight 214, stated. "Luckily the seat I was sitting, it has [sic] one more strap coming across my chest here [indicating] in addition to the one that goes around the waist cause it was a sleeper seat. If I did not have that, I'd have hit the ceiling. That's how hard the impact was." *See* July 7, 2013 interview of Eugene Rah, located at http://www.cnn.com/video/data/2.0/video/us/2013/07/07/nr-sf-plane-crash-survivor-eugene-rah.cnn.html.

83. Passengers not equipped with multipoint harnesses suffered injuries, including but not limited to abdominal, spinal, and head injuries, when they were violently jerked in their seats

1 from the impact. In describing the role of lap-only seat belts in causing a Flight 214 passenger's
2 unstable fracture of his cervical spine, St. Mary's Medical Center surgeon Dimitriy Kondashov
3 stated, "Because there was no shoulder component to his seat belt, that allowed [the passenger] to
4 violently slam [his] forehead into the seat in front of him, and then this resulted in some head
5 trauma." See William Harless, "Seat-Belt Design Played Role in Asiana Crash Injuries" WALL
6 STREET JOURNAL, July 10, 2013. Had passengers in Economy Class safely been restrained by lap and
7 shoulder harnesses, many injuries would have been prevented and/or mitigated.

8 **V.     CAUSES OF ACTION**

9                    **FIRST CAUSE OF ACTION**
                         **NEGLIGENCE**
10               **(Against Defendant Asiana Airlines Inc.)**

11         84.     Plaintiffs incorporate and re-allege each of the allegations set forth above as though
12 fully set forth herein.

13         85.     At all relevant times, ASIANA was a common carrier engaged in the business of
14 providing air transportation for fare-paying passengers on international flights to the United States.
15 As a common carrier, ASIANA owed Plaintiffs as passengers of Flight 214 a duty of utmost care and
16 the vigilance for the safe transport of passengers.   As the holder of an Air Carrier Operating
17 Certificate authorized to serve as a common carrier in air transportation in the United States pursuant
18 to the provisions of Part 121 of the Federal Aviation Regulations [14 C.F.R. 121.1 et seq.], ASIANA
19 owed a duty of care to Plaintiffs consistent with the requirement that it operate and maintain its
20 aircraft in the safest manner.  ASIANA also had a common law duty to operate and maintain
21 ASIANA Flight 214 to a standard equal to the highest possible degree of safety.

22         86.     At all times hereinabove set forth, ASIANA breached its duty of care to Plaintiffs as
23 passengers aboard ASIANA Flight 214 with respect to its failure to safely operate, maintain, manage,
24 control, equip, handle, and/or pilot Flight 214 and/or adequately and appropriately train its pilots and
25 crew to operate a passenger aircraft, including but not limited to the following:

26               •        failure to train its pilots and flight crew to constantly monitor aircraft
27                        airspeed;

28

**COMPLAINT**                                                                                    29

1         •   failure to train its pilots to safely operate the auto-throttle control system
2            aboard the aircraft;

3         •   failure to train its pilots to safely operate the auto-pilot system aboard the
4            aircraft;

5         •   failure to train its pilots to safely operate the flight director aboard the
6            aircraft;

7         •   failure to train its pilots to communicate with one another in order to
8            safely operate and monitor flight systems aboard the aircraft;

9         •   failure to train its pilots to prevent their aircraft from entering into unsafe
10           airspeeds given the flight condition/s;

11         •   failure to train its pilots to timely recognize and safely respond to low
12           airspeeds given the flight condition/s;

13         •   failure to train its pilots to timely and safely evacuate the aircraft.

14     87.     As a direct and legal result of the negligence, carelessness, gross negligence, 15 recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, Plaintiffs have 16 suffered the injuries and damages hereafter set forth.

17     88.     As a legal result of the wrongful conduct of ASIANA set forth above, Plaintiffs were 18 injured in their health, strength, and activity, and have sustained injuries to their bodies and/or minds, 19 all of which have caused Plaintiffs great physical, mental, emotional, and nervous pain and suffering.

20     89.     By reason of the wrongful conduct of ASIANA set forth above, Plaintiffs were 21 required to and continue to employ physicians and other health care providers to examine, treat, and 22 care for their injuries, and have incurred, and will continue to incur, medical and incidental expenses 23 for such examination, treatment, rehabilitation, and care in an amount according to proof.

24     90.     By reason of the incident, Plaintiffs have suffered a loss of income, and/or a loss of 25 earning capacity, in an amount according to proof.

26     91.     By further reason of the premises, Plaintiffs, and each of them, suffered the loss of 27 their personal property, including but not limited to personal effects and items in checked in luggage 28 and carry-on items, in an amount according to proof at trial.

92.    The Montreal Convention, formally entitled the Convention for the Unification of Certain Rules for International Carriage by Air, sets forth the liability and compensation owed by airlines for the injury and death of a passenger.  Under Article 21(2), Plaintiffs are entitled to provable  damages in excess of 113,100 Special Drawing Rights ("SDR") due to the negligence, carelessness, gross negligence and/or recklessness of Defendant ASIANA, its agents and/or its servants, as hereinabove set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**PASSENGER LIABILITY / STRICT LIABILITY**
**(Against Defendant Asiana Airlines Inc.)**

93.    Plaintiffs incorporate and re-allege each of the allegations set forth above as though fully set forth herein.

94.    At all relevant times, ASIANA was a common carrier engaged in the business of providing air transporting fare-paying passengers on international flights to the United States.

95.    Under Articles 17 and 21(a) of the Montreal Convention, Defendant ASIANA is strictly liable to Plaintiffs for provable damages of up to 113,100 SDRs (which equates to approximately U.S. Dollar $170,000).

96.    In addition, under Article 21(2) of the Montreal Convention, due to the negligence, carelessness, gross negligence, and/or recklessness hereinabove set forth and the injuries and damages attendant thereto Plaintiffs seek damages in excess of 113,100 SDRs, according to proof at the time of trial, as hereinabove alleged.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(Against Defendant The Boeing Company)**

97.    Plaintiffs incorporate and re-allege each of the allegations set forth above as though fully set forth herein.

98.    At all relevant times hereinabove set forth, Defendant BOEING was the designer, manufacturer, distributor and/or seller of the BOEING 777 aircraft and its subsequent variants, including the subject BOEING 777-200ER. Defendant BOEING was, at all times relevant, in the

COMPLAINT                                                                                                              31

1  business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing

2  and/or inspecting aircraft as suitable and safe for passenger air transportation, including the subject

3  BOEING 777-200ER that crashed at SFO on July 6, 2013.

4    99.  At all relevant times hereinabove set forth, Defendant BOEING operated, supervised,

5  managed and/or oversaw the training facility that trained ASIANA's pilots to fly the BOEING 777,

6  and knew or should have known of the unfitness of ASIANA pilots to safely operate the BOEING

7  777-200ER for passenger air travel.

8    100.  At all times hereinabove set forth, BOEING breached its duty of care to Plaintiffs as

9  passengers aboard ASIANA flight 214 with respect to the design, manufacture, inspection, testing,

10  assembly, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct,

11  and/or issue advisory warnings necessary to assure the safe operation, control, management and/or

12  maintenance of the aircraft. BOEING acts and/or omissions include, but are not limited to the

13  following:

14     • failure to manufacture and provide a safe and effective auto-throttle

15      control system on their aircraft, including the subject aircraft;

16     • failure to provide adequate warnings with regard to the use of the auto-

17      throttle control system on their aircraft including the subject aircraft;

18     • failure to manufacture and provide a safe and adequate low airspeed

19      warning device on their aircraft, including the subject aircraft;

20     • failure to provide adequate warnings with regard to the use of the flight

21      control systems on their aircraft including the subject aircraft;

22     • failure to manufacture and provide safe and effective flight director

23      systems, EICAS, flight control computers and/or primary flight displays on

24      their aircraft, including the subject aircraft.

25     • failure to manufacture and provide safe and effective seating for its

26      passengers, which included improper seatbelts, particularly for Plaintiffs

27      and those passengers of ASIANA Flight 214 who were seated in economy

28      class who had lap-only seatbelts.

**COMPLAINT**                           32

1              ● failure to properly train pilots to constantly monitor aircraft airspeed;

2              ● failure to properly train pilots to safely operate the auto-throttle control

3                 system aboard their aircraft;

4              ● failure to properly train pilots to safely operate the auto-pilot system

5                 aboard their aircraft;

6              ● failure to properly train pilots to safely operate and safely respond to the

7                 flight director aboard their aircraft;

8              ● failure to properly train pilots to safely operate, monitor and respond to the

9                 flight systems aboard their aircraft;

10            ● failure to properly train pilots to prevent their aircraft from entering into

11              unsafe airspeeds given the flight condition/s;

12            ● failure to properly train pilots to timely recognize and safely respond to

13              low airspeeds given the flight condition/s.

14            ● failure to properly train pilots to safely operate their aircraft in both Visual

15              Meteorological Conditions ("VMC") and Instrument Meteorological

16              Conditions ("IMC") conditions.

17      101.    As a direct and legal result of Defendant BOEING's negligence, carelessness, gross

18 negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth,

19 Plaintiffs have suffered the injuries and damages hereafter set forth.

20      102.    As a legal result of the wrongful conduct of BOEING set forth above, Plaintiffs were

21 injured in their health, strength, and activity, and have sustained injuries to their bodies and/or minds,

22 all of which has caused Plaintiffs great physical, mental, emotional, and nervous pain and suffering.

23      103.    By reason of the wrongful conduct of BOEING set forth above, Plaintiffs were

24 required to and continue to employ physicians and other health care providers to examine, treat, and

25 care for their injuries, and have incurred, and will continue to incur, medical and incidental expenses

26 for such examination, treatment, rehabilitation, and care in an amount according to proof.

27      104.    By reason of the incident, Plaintiffs have suffered a loss of income and/or a loss of

28 earning capacity, in an amount according to proof.

1    105.    By further reason of the premises, Plaintiffs, and each of them, suffered the loss of

2   their personal property, including but not limited to personal effects and items in checked in luggage

3   and carry-on items, in an amount according to proof at trial.

4        WHEREFORE, Plaintiffs pray for relief as set forth below.

5                      **FOURTH CAUSE OF ACTION**
                           **BREACH OF WARRANTY**
6                    **(Against Defendant The Boeing Company)**

7    106.    Plaintiffs incorporate and re-allege each of the allegations set forth above as though

8   fully set forth herein.

9    107.    Defendant BOEING was the designer, manufacturer, distributor and/or seller of the

10   Boeing 777 and its subsequent variants, including the BOEING 777-200ER.

11   108.    Prior to the crash of ASIANA Flight 214, Defendant BOEING expressly and/or

12   impliedly warranted and represented that the subject aircraft (the BOEING 777-200ER), including

13   its component parts and instruments, and in conjunction with the instructions and warnings given

14   by BOEING, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial

15   air travel for which it was designed, intended and used. Additionally, Defendant BOEING further

16   warranted that the subject aircraft and/or its component parts was free from all defects.

17   109.    Defendant BOEING breached said warranties in that the subject aircraft was not

18   airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed,

19   intended and used, and free from all defects as set forth above.

20   110.    Plaintiffs, as passengers of ASIANA Flight 214, were intended third-party

21   beneficiaries of Defendant BOEING's warranties that ASIANA Flight 214 (the BOEING

22   777-200ER) was airworthy, of merchantable quality, both fit and safe for the purposes for which it

23   was designed, intended and used, and free from all defects.

24   111.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set

25   forth, Defendant BOEING breached said warrantees and caused Plaintiffs to suffer the injuries and

26   damages hereinabove set forth.

27       WHEREFORE, Plaintiffs pray for relief as set forth below.

28   / / /

1

2

**FIFTH CAUSE OF ACTION**
**STRICT LIABILITY**
**(Against Defendant The Boeing Company)**

3     112.   Plaintiffs incorporate and re-allege each of the allegations set forth above as though

4   fully set forth herein.

5     113.   Defendant BOEING designed, manufactured, distributed and/or sold BOEING 777

6   and its subsequent variants, including the BOEING 777-200ER involved in the incident. Defendant

7   BOEING was in the business of designing, testing, manufacturing, selling, assembling, building,

8   distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation,

9   including the subject BOEING 777-200ER that crashed at SFO on July 6, 2013.

10    114.   At all times relevant hereinabove set forth, the subject BOEING 777-200ER aircraft

11  was being operated by ASIANA and used for the purposes of which it was manufactured, designed,

12  inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant BOEING.

13    115.   At all times relevant hereinabove set forth, the subject BOEING 777-200ER was

14  defective, dangerous, unsafe, and not airworthy by reason of Defendant BOEING's defective

15  manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the

16  subject aircraft as set forth above.

17    116.   As a direct and legal result of the wrongful acts and/or omissions of Defendant

18  BOEING, hereinabove alleged, Plaintiffs have suffered the injuries and damages heretofore set forth.

19        WHEREFORE, Plaintiffs pray for relief as set forth below.

20  **VI.   PRAYER FOR RELIEF**

21        WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as

22  hereinafter set forth below.

23        1.    For compensatory and general damages according to proof;

24        2.    For past and future medical expenses and incidental expenses according to proof;

25        3.    For past and future loss of earnings and earning capacity according to proof;

26        4.    For loss of personal property and personal effects according to proof;

27        5.    For pre- and post-judgment interest on all damages as allowed by the law;

28        6.    For attorneys and expert/consultant fees under existing law;

COMPLAINT                                                                          35

7. For punitive damages in an amount according to proof, or taking some measure to ensure that an example is made of Defendants to deter similar future conduct;

8. For costs of suit incurred herein; and

9. For such other and further relief as the Court may deem just and proper.

Dated: August 8, 2013

**COTCHETT PITRE & McCARTHY, LLP**

By: _____

FRANK M. PITRE
*Attorneys for Plaintiffs*

## VII.   JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated: August 8, 2013

**COTCHETT PITRE & McCARTHY, LLP**

By: _____

FRANK M. PITRE
*Attorneys for Plaintiffs*